# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kristine A. Kieland, Scott J. Kieland,          Civil No. 05-150 (DWF/SRN)
Stanford P. Evavold, Jr., Kathleen D.
Evavold, and Katstan Inc.,

          Plaintiffs,

v.                                   **MEMORANDUM**
                            **OPINION AND ORDER**
Rocky Mountain Chocolate Factory Inc.,

          Defendant.

---

W. Michael Garner, Esq., and William S. Fulton, Jr., Esq., Dady & Garner, PA, counsel for Plaintiffs.

Jeffrey J. Cowman, Esq., Perkins Coie, and Jon S. Swierzewski, Esq., Larkin Hoffman Daly & Lindgren Ltd., counsel for Defendant.

---

## Introduction

This matter is before the Court pursuant to a Motion for Summary Judgment brought by Defendant Rocky Mountain Chocolate Factory, Inc. ("Rocky Mountain"). In their Amended Complaint (the "Complaint"), Plaintiffs Kristine A. Kieland, Scott J. Kieland, Stanford P. Evavold, Jr., Kathleen D. Evavold, and Katstan Inc., (collectively, the "Plaintiffs") allege violations of the Minnesota Franchise Act ("MFA"), common law fraud, breach of contract, and breach of the implied covenant of good faith and fair dealing. For the reasons set forth below, the Court grants Rocky Mountain's motion.

**Background**

Rocky Mountain, a Colorado corporation, is the franchisor of retail stores that sell chocolate and other premium confectionary products that have been manufactured and packaged by Rocky Mountain or that are made in the retail stores.  Plaintiffs Kristine A. Kieland and Scott J. Kieland (collectively, "the Kielands") entered into a Rocky Mountain Franchise Agreement ("the Franchise Agreement") on or about March 28, 2001.  The Kielands closed their franchise in May 2005 due to financial difficulty.  Plaintiffs Stanford P. Evavold, Jr., Kathleen D. Evavold, and Katstan Inc. (collectively, "the Evavolds") entered into a similar Rocky Mountain Franchise Agreement ("the Franchise Agreement") on or about January 25, 2002, and continue to operate their franchise in Maple Grove, Minnesota.

Before Plaintiffs signed their Franchise Agreements, Rocky Mountain provided them with Uniform Franchise Offering Circulars ("UFOCs").  Plaintiffs admit that they received, read, and fully understood the UFOCs prior to signing their Franchise Agreements.  Plaintiffs also admit that they received, read, and fully understood the Franchise Agreements prior to signing them.

**Claims**

Plaintiffs initiated this lawsuit, alleging six counts:  (1) violation of the MFA—Disclosure; (2) Common Law Fraud; (3) Breach of Contract—Support and Training; (4) Violation of the MFA—Wrongful Termination; (5) Breach of Contract—Wrongful Termination; and (6) Breach of Implied Covenant of Good Faith and Fair Dealing.  Addressing each claim in its principal brief, Rocky Mountain contends that the undisputed

2

facts fail to support any of Plaintiffs' claims and requests that the Court grant summary judgment in its favor.  In response, Plaintiffs failed to make any arguments regarding Counts 2, 3, 4, and 5 in their opposition brief.  Therefore, Plaintiffs have abandoned these claims. *See Thomsen v. Ross*, 368 F. Supp. 2d 961, 974 n.9 (D. Minn. 2005) (concluding that plaintiff had abandoned claims not addressed in his response in opposition to summary judgment motion).  In addition, regarding Count 1, Plaintiffs failed to make any arguments regarding their claims that Rocky Mountain failed to provide support regarding nutritional information and labeling and with selecting a franchise site.[1]  Additionally, regarding Count 6, Plaintiffs failed to make any arguments regarding their claim that Rocky Mountain violated the implied covenant of good faith and fair dealing by allegedly failing to provide support and continuing training. Thus, Plaintiffs have also abandoned these claims.  *Id.*

Thus, portions of Counts 1 and 6 remain.  Specifically, in Count 1, Plaintiffs assert that Rocky Mountain violated the MFA by failing to disclose material information in the UFOCs, making material misrepresentations in connection with the franchise sales, and discriminating against them.  In Count 6, Plaintiffs contend that Rocky Mountain breached the implied covenant of good faith and fair dealing by attempting to terminate their Franchise Agreements.  The following facts are relevant to Plaintiffs' claims.

---

[1]      Further, regarding Count 1, Rocky Mountain asserts that the Evavolds have untimely asserted a claim that Rocky Mountain misrepresented the earnings capabilities of the Evavolds' franchise and requests that the Court therefore dismiss this claim.  The Court, however, finds that this claim fails on the merits and therefore does not reach the issue of whether the claim is untimely.

**Point-of-Sale System**

Several of Plaintiffs' claims relate to Rocky Mountain's requirement that they

purchase a specific point-of-sale ("POS") system.  In particular, the Kielands' UFOC stated:

> We require you to use an electronic point of sale cash register system
> (POS System") in your Store which you must purchase from our designated
> supplier, Retail Data Systems ("RDS") . . . As of the date of this Offering
> Circular, the POS System consists of a Casio TK-2700 register . . . The Casio
> register will be delivered to you already loaded with [Rocky Mountain's]
> proprietary POS data.  [Rocky Mountain] and/or RDS will provide all support,
> updates and maintenance for your POS System.  We do not charge you a fee
> for our support services, but RDS currently charges an annual maintenance
> fee of $773 for each POS System you own. You may choose not to purchase
> a maintenance agreement with RDS, but you are responsible for ensuring that
> your POS Systems are operating in accordance with our standards.  Most
> Stores require two POS Systems.  We may require you to upgrade or update
> your POS Systems.  No contractual limitation exists on the frequency or cost
> of this obligation.

(Cowman Aff., ¶ 2, Ex. A Part 1 ("Kieland UFOC") at 00470.)  After signing their Franchise

Agreement and while attending training in Durango, Colorado, Rocky Mountain told the

Kielands that instead of purchasing the Casio POS system they would have to purchase a

different, new POS system that Rocky Mountain had recently begun using.  This new POS

system, referred to as the "AIM system," cost almost $20,000.

Rocky Mountain explained that it required franchisees to purchase the new AIM

system on a prospective basis.  Bryan Merryman, Rocky Mountain's Chief Executive

Officer, explained, "when major initiatives are adopted by the company, generally those

initiatives are required on a prospective basis, not—we do not require the entire system to

do them, especially when there is a capital outlay involved." (Decl. of Michel Garner in

Supp. of Mem. in Opp'n ("Garner Decl."), ¶ 3, Ex. 1, Dep. of Bryan Merryman ("Merryman Dep.") at 43.)  Thus, Rocky Mountain did not require existing franchisees to purchase the new AIM system; rather, these franchisees continued using their old Casio systems.  About half of all Rocky Mountain franchisees have purchased the new AIM system.

Additionally, Rocky Mountain told the Kielands that they were required to pay an annual maintenance fee of almost $2,000 for the AIM system.  The Kielands maintain that Rocky Mountain did not show them any agreement for the AIM system.  The Kielands also maintain that at the training session in Durango, Rocky Mountain told them that the AIM system would be "state of the art" and would provide "productivity reporting, inventory control, simplified payroll and financial reporting."  (Decl. of Scott Kieland ("Kieland Decl.") at ¶ 2.)  The Kielands contend that after they began using the AIM system, they discovered that "it had none of the attributes that were promised to us."  (Kieland Decl. at ¶ 2.)  Therefore, the Kielands subsequently refused to pay the AIM annual maintenance fee.

In response, Rocky Mountain sent the Kielands a "Notice to Cure," dated August 31, 2004 ("the August 2004 Notice to Cure"), that stated in part, "you have 30 days from the date of delivery of this notice to cure this violation and provide us with proof of the cure or we may terminate your agreement."  (Kieland Decl., Ex. 2.)  Rocky Mountain subsequently withdrew the August 2004 Notice to Cure.  Rocky Mountain later sent another "Notice to Cure," dated February 24, 2005 ("the February 2005 Notice to Cure"), alleging that the Kielands had failed to install and continuously use the AIM system and failed to maintain a

support contract with AIM whereby Rocky Mountain can "poll" information from the AIM

system.  (*Id.*, Ex. 3.)  Rocky Mountain subsequently withdrew the Second Notice to Cure.

The Evavolds' UFOC, which was distributed shortly after the Kielands' UFOC, stated

that they were required to purchase the new AIM system.  In particular, the Evavolds' UFOC

stated:

> We require you to use an electronic point of sale cash register system
> ("POS System") in your Store which you must purchase from us.  As of the
> date of this Offering Circular, the POS System consists of an NCR 7460 cash
> register system, FTP Store Communication software, PC/Anywhere,
> IC/Verify software, an Epson TM88 thermal receipt printer, a POS scale, a
> 56K (minimum) modem, a laser bar code scanner, a bar code printer and a
> Hewlett Packard Deskjet printer.  You must dedicate one phone line to the
> POS System.  The POS System will be delivered to you already loaded with
> proprietary POS software owned by AIM Software Systems Incorporated,
> 1304 Pacific Street, San Luis Obispo, California 93401, (805) 546-2900
> ("AIM").  AIM will provide all support, updates and maintenance for your
> POS System.  As of the date of this Offering Circular, AIM charges an annual
> support fee of $1,922 for the POS System regardless of the number of cash
> registers.  You are required to purchase a support agreement with AIM.  Most
> stores require two cash registers.  We may require you to upgrade or update
> your POS Systems.  No contractual limitation exists on the frequency or cost
> of this obligation.

(Cowman Aff., ¶ 2, Ex. A Part II ("Evavold UFOC") at 00120.)  The Evavolds' UFOC also

stated that the AIM system "provides you with detailed information about your inventory,

sales, purchasing, receiving, time and attendance."  (*Id.*)

Like the Kielands, the Evavolds maintain that Rocky Mountain did not present them

with a copy of the AIM maintenance agreement.  Additionally, the Evavolds contend that the

AIM system was "so poor" that they quit paying the $2,000 annual maintenance fee in 2003.

 (Decl. of Stanford P. Evavold ("Evavold Decl.") at ¶ 5.)  Rocky Mountain sent the Evavolds

6

a "Notice to Cure" letter, dated February 24, 2005 ("the February 2005 Notice to Cure"),

that alleged that the Evavolds had failed to install and continuously use the AIM system and

failed to maintain a support contract with AIM whereby Rocky Mountain can "poll"

information from the AIM system.  (Evavold Decl., Ex. 6.)  Rocky Mountain subsequently

withdrew the February 2005 Notice to Cure.

**Earnings Claim**

The Evavolds' UFOC contained the following bolded disclaimer regarding earnings

claims:

> Except for the information in this item, no representations or statements of
> actual, average, projected, forecasted or potential sales, costs, income or
> profits are made to franchisees by us.  We do not furnish or make, or
> authorize our sales personnel to furnish or make, any oral or written
> information concerning the actual, average, projected, forecasted or potential
> sales, costs, income or profits of a franchise or prospects or chances of
> success that any franchisee can expect or that present or past franchisees have
> had, other than as set forth in this item.  We disclaim and will not be bound by
> any unauthorized representations.

(Evavold UFOC at 00130.)  Additionally, the Evavolds' Franchise Agreement states that

Rocky Mountain "shall not be liable or obligated for any oral representations or

commitments made prior to the execution hereof or for claims of negligent or fraudulent

misrepresentation based on any such oral representations or commitments."  (Cowman Aff.,

¶ 3, Ex. B Part II "Evavold Franchise Agreement") at 00997.)  The Franchise Agreement

also states that "[t]he Franchisee further acknowledges and agrees that no representations

have been made to it by the Franchisor regarding projected sales volumes, market potential,

revenues, profits of the Franchisee's [Rocky Mountain] Store, or operational assistance

other than as stated in this Agreement or in any disclosure document provided by the

Franchisor or its representatives." (*Id.*) The Evavolds further agreed that they were "solely

responsible for the successful operation of [their Rocky Mountain] Store," acknowledged

that the success of their business involved substantial risks and depended upon their ability

as independent business persons, and agreed that Rocky Mountain had not made assurances

or warranties as to the potential success or earnings of their store. (*Id.* at 00974, 00998–

99.)

Despite these provisions and acknowledgements, the Evavolds contend that prior to

entering into the Franchise Agreement, Rocky Mountain made "earnings claims," or

projections of earnings to Stanford Evavold. To support this claim, Stanford Evavold

contends that he presented a pro forma budget for his franchise to Kraig Carlson, a Rocky

Mountain salesperson. Stan Evavold's contention that he presented a pro forma budget to

Carlson is based on an email that Stan Evavold sent to Carlson. That email stated in relevant

part:

> I am also attaching some of the numbers I put together. I know I am missing
> information on depreciation, and have to insert those still. I am sure I am
> missing other expenses.
>
> I don't believe you can state if these appear reasonable, but maybe you can
> tell me if it is a "rainy day" or "sunny day".

(Evavold Decl., ¶ 2, Ex. 1.) Stanford Evavold contends that Carlson responded that the

numbers "did not raise any issues with him." (*Id.*, ¶ 2.) Stanford Evavold further contends

that he signed the Franchise Agreement on the basis of Carlson's assurances. The Evavolds

franchise did not achieve the projections stated in the alleged earnings claim.

**Royalty Fees**

Plaintiffs also contend that when they entered their Franchise Agreements, Rocky

Mountain had a policy and practice of waiving royalty fees for certain franchisees

experiencing financial difficulties.  Plaintiffs further allege that Rocky Mountain failed to

disclose this policy prior to their signing the Franchise Agreements.  In his declaration,

Stanford Evavold contends that had he known of this alleged policy, he would not have

become a franchisee because such a policy would have a tendency to artificially inflate the

number of franchisees.  The Kielands criticize the alleged lack of disclosure for a different

reason.  In his declaration, Scott Kieland contends that Rocky Mountain never offered to

waive his royalty fees, despite his assertion that he told Rocky Mountain that his franchise

was experiencing financial distress.  Yet, in his deposition, Scott Kieland testified that he

was aware of the alleged policy but did not qualify:

> Q:  Mr. Pope told you that if your royalties dropped to a certain level –
>
> A:  If our sales dropped below $100,000, typically you have to be down
> around $100,000 in sales, at that point they would consider waiving royalties.
> We didn't get to that point.

(Cowman Aff., ¶ 4, Ex. C ("Kieland Dep.") at 153.)

Rocky Mountain admits that is has agreed to waive royalty fees for a limited number

of franchisees.  Merryman testified that waiving royalty fees is not "a customary practice,"

but he further stated, "[u]nder certain limited structure or certain limited circumstances, we

have waived royalties for specific periods of time in the past." (Merryman Dep. at 49.)

Merryman explained that Rocky Mountain had waived royalty fees at some franchisees'

requests based on "some financial hardship." (*Id.*) Greg Pope, Senior Vice President of

Franchise Operations, further testified that there is no established standard or level of

financial distress that a franchise must have to qualify for a royalty waiver. (Garner Decl., ¶

4, Ex. 2, Depo. of Gregory Pope ("Pope Dep.") at 25.) Rather, Pope testified that Rocky

Mountain only considers waiving royalty fees in "unique circumstances" that typically

involve "unforeseen circumstances." (*Id.* at 26.) Pope stated that Rocky Mountain is

currently waiving royalty fees for approximately 5 of its 300 franchisees. (*Id.*)

## Discussion

### I.     Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court

must view the evidence and the inferences, which may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna*

*Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has

stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record, which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Minnesota Franchise Act

The MFA, Minn. Stat. §§ 80C.01–80C.22 (2004), governs how franchises are established and terminated. The MFA's provisions were designed to protect potential franchisees from unfair contracts and business practices. *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn. 1978). Plaintiffs allege that Rocky Mountain violated the MFA by failing to provide Plaintiffs with full and complete UFOCs, making material misrepresentations regarding the sale of the franchises, and by discriminating between franchisees. The Court will address each argument in turn.

### A.     UFOC Disclosure

Plaintiffs allege that Rocky Mountain violated the MFA by failing to provide them with full and complete UFOCs. Specifically, Plaintiffs allege that Rocky Mountain violated Minn. Stat. § 80C.13, subd. 1 (2004), which states in relevant part, "No person may make or cause to be made any untrue statement of a material fact in any application, notice, report,

11

or other document filed with the commissioner . . . or omit to state in any such application, notice, report or other document any material fact which is required to be stated therein." Plaintiffs contend that Rocky Mountain violated that provision by: (1) failing to disclose that Rocky Mountain had a policy and practice of waiving royalty fees; (2) failing to disclose the cost of the new AIM system to the Kielands; (3) failing to disclose the lack of capabilities of the AIM system; (4) failing to disclose that some franchisees had been excused from purchasing the AIM system; (5) failing to provide any disclaimers or reasonable basis for Carlson's alleged earnings claim; and (6) failing to include copies of the AIM maintenance agreements. Plaintiffs contend that had they known these facts, they would not have become Rocky Mountain franchisees. The Court will address each claim in turn.

### 1.    Waiver of Royalty Fees

Plaintiffs allege that Rocky Mountain failed to disclose that it had a policy and practice of waiving royalty fees for some franchisees. The Court finds that this claim fails as a matter of law. Here, the record is undisputed that Rocky Mountain has agreed in certain limited circumstances to waive a small number of franchisees' royalty fees for a fixed period of time based on unique and unforeseen operational challenges. Rocky Mountain executives testified that Rocky Mountain is currently waiving 5 of its 300 franchisees' royalty fees. The Court finds that, on this record, these waivers do not constitute a material fact that Rocky Mountain was required to disclose. *See* Minn. Stat.

80C.13, subd. 1 (2004).  Accordingly, the Court grants summary judgment in favor of Rocky Mountain on this claim.

### 2.    Cost of AIM System

The Kielands contend that Rocky Mountain failed to disclose the cost of the new AIM system.  The Court finds that this claim fails as a matter of law.  The Kielands' UFOC identified the POS system then in use as a Casio TK-2700.  Although a maintenance agreement was not required, the Kielands were "responsible for insuring that [their] POS Systems are operating in accordance with our standards."  (Kieland UFOC at 00470.)  The Kielands' UFOC further indicated that Rocky Mountain "may require you to upgrade or update your POS Systems."  (*Id.*)  Pursuant to Rocky Mountain's right to require franchisees to "upgrade or update" their POS systems, Rocky Mountain required the Kielands to purchase the AIM system, instead of the Casio system shortly after they executed their Franchise Agreement.  And the Kielands' UFOC states that "No contractual limitation exists on the frequency or cost of this obligation."  (*Id.*)

Thus, although the expense of the AIM system was approximately $13,000 more than the Casio system and the maintenance fee was about $1,200 more, the UFOC authorized Rocky Mountain to require the Kielands to purchase the AIM system. Moreover, the Kielands' initial investment remained within the estimate disclosed by Rocky Mountain in the UFOC.  The Court also notes that the Kielands admit that Rocky Mountain was authorized to require franchisees to purchase the new AIM system pursuant to its right to require franchisees to "upgrade or update" their POS systems.  The Kielands concede this

point because they assert that Rocky Mountain discriminated against them by not requiring all franchisees to purchase the AIM system pursuant to Rocky Mountain's right to require franchisees to update or upgrade their POS systems.  Thus, the Court grants summary judgment in favor of Rocky Mountain on this claim.

### 3.   Capabilities of AIM System

Plaintiffs contend that Rocky Mountain failed to disclose the AIM system's lack of capabilities.  The Kielands allege that Rocky Mountain told them that the AIM system would be "state of the art" and would provide "productivity reporting, inventory control, simplified payroll and financial reporting."  (Kieland Decl. at ¶ 2.)  The Evavolds contend that the AIM system was "so poor" that they ceased paying the maintenance fee.  (Evavold Decl. at ¶ 5.)  In response, Rocky Mountain contends that it is undisputed that the AIM System does provide information regarding inventory, sales, purchasing, receiving, time and attendance—the functions stated in the UFOC.  Rocky Mountain contends that Plaintiffs complain that the AIM System does not provide functions at a level that Plaintiffs believe to be appropriate.  The Court agrees.  Here, Rocky Mountain represented in the UFOC that the AIM system would perform certain functions, and it does.  Rocky Mountain did not make representations regarding the specific nature or quality of those features that would support Plaintiffs' claim.  Thus, the Court grants summary judgment in favor of Rocky Mountain on this claim.

### 4.    Excuse from Purchasing the AIM System

Plaintiffs contend that Rocky Mountain failed to disclose that it had excused

some franchisees from purchasing the AIM system.  The Court finds that this claim fails as

a matter of law.  Although the UFOC reserves Rocky Mountain's right to require that

existing franchisees upgrade or update their POS systems, Rocky Mountain was not

required to make existing franchisees purchase the new AIM system.  Here, Merryman

explained that Rocky Mountain generally implemented major initiatives on a prospective

basis.  Merryman further explained that Rocky Mountain did not require existing

franchisees to adopt a major initiative because of the capital outlay involved.  Thus, on this

record, the Court grants summary judgment in favor of Rocky Mountain on this claim.

### 5.    Earnings Claim

The Evavolds claim that Carlson gave Stan Evavold an earnings claim based upon an

email that Stan Evavold sent to Carlson that attached a budget and stated, "I don't believe you

can state if these appear reasonable, but maybe you can tell me if it is a "rainy day" or

"sunny day."  The Evavolds contend that Carlson gave them an earnings claim by replying

that the numbers "did not raise any issues."  Thus, according to the Evavolds, Carlson should

have provided disclaimers or a reasonable basis for Carlson's opinion.  Regardless of

whether Carlson's vague response to Stan Evavold's email message constitutes an earnings

claim, the Court finds that the Evavolds' claim fails as a matter of law.  Here, the Evavolds'

UFOC clearly states that Rocky Mountain does not authorize its sales personnel to make

any oral projections regarding a franchisee's potential success.  The UFOC states in bold

letters:

> Except for the information in this item, no representations or statements of
> actual, average, projected, forecasted or potential sales, costs, income or
> profits are made to franchisees by us.  We do not furnish or make, or
> authorize our sales personnel to furnish or make, any oral or written
> information concerning the actual, average, projected, forecasted or potential
> sales, costs, income or profits of a franchise or prospects or chances of
> success that any franchisee can expect or that present or past franchisees have
> had, other than as set forth in this item.  We disclaim and will not be bound by
> any unauthorized representations.

(Evavold UFOC at 00130.)

Moreover, Stan Evavold testified that he understood and agreed as part of his

decision to enter into the Franchise Agreement that Rocky Mountain did not "furnish or

make or authorize its sales personnel to furnish or make any oral or written information

concerning the actual, average, projected, forecasted or potential sales, costs, income or

profits of a franchise or prospects or chances of success that any franchisee can expect."

(Evavold Dep. at 71.)  Stan Evavold further acknowledged that Rocky Mountain "disclaims

and will not be bound by any unauthorized representations."  (*Id.*)  Thus, on this record, the

Evavolds' claim fails as a matter of law.  *See Carlock v. Pillsbury Co.*, 719 F. Supp. 791,

828 (D. Minn. 1989) (dismissing claims based on alleged oral representations that were

expressly contradicted by the terms of an applicable offering statement).  Accordingly, the

Court grants summary judgment in favor of Rocky Mountain on this claim.

### 6.  Copies of the AIM Maintenance Agreements

Finally, Plaintiffs contend that Rocky Mountain failed to include copies of the

16

AIM maintenance agreements with the UFOCs.  The MFA provides, in part, "[a]ny person offering for sale or selling any franchise . . . shall . . . present to the prospective franchisee . . . a copy of the current public offering statement together with a copy of all proposed agreements relating to the sale of the franchise."  Minn. Stat. § 80C.06, subd. 5 (2004).  The UFOC may be prepared in accordance with guidelines promulgated by the North American Securities Administrators Association (the "NASAA Guidelines").  *See* Minn. R. 2860.3800 (2004) ("The commissioner may accept as application for registration the Uniform Franchise Registration Application adopted by the North American Securities Administrators Association; however, the commissioner reserves the right to require alterations in the [UFOC] as necessary.")  Plaintiffs contend that pursuant to this rule, Rocky Mountain's UFOC was required to follow the NASAA Guidelines.  Rocky Mountain does not refute this contention; rather, Rocky Mountain asserts that the UFOCs complied with the NASAA Guidelines.

In relevant part, Item 22 of the NASAA guidelines, entitled "Contracts," states, "Attach a copy of all agreements proposed for use or in use in this state regarding the offering of a franchise, including, the franchise agreement, leases, options and purchase agreements."  (Garner Decl., ¶ 7, Ex. 5 at 84.)  Item 22 further states, "Copies of agreements attached to the offering circular under Item 22 are part of the offering circular. Each offering circular delivered to a prospective franchisee must include copies of all agreements to be offered."  *Id.*  Plaintiffs contend that Rocky Mountain was required to attach a copy of the AIM maintenance agreement to the UFOC pursuant to Item 22.  And

because Rocky Mountain did not attach such copies, Plaintiffs contend that Rocky Mountain violated the MFA's disclosure provision.  In response, Rocky Mountain contends that the MFA only requires it to attach copies of agreements entered into between Rocky Mountain and the franchisee.  Thus, Rocky Mountain contends that it was not required to attach a copy of the AIM maintenance agreement.

The Court finds that it need not interpret whether Item 22 required Rocky Mountain to attach a copy of the AIM maintenance agreement to the UFOCs, even assuming that Rocky Mountain was required to follow all NASAA Guidelines.  *See* Minn. R. 2860.3800 (2004) ("The commissioner may accept as application for registration the Uniform Franchise Registration Application adopted by the North American Securities Administrators Association; however, the commissioner reserves the right to require alterations in the [UFOC] as necessary.")  Additionally, the Court need not interpret whether Minn. Stat. § 80C.06, subd. 5 (2004), required Rocky Mountain to attach a copy of the AIM maintenance agreement pursuant to that statute's requirement that a franchisor present plaintiffs with a copy of "all proposed agreements relating to the sale of the franchise" along with the UFOCs.  The Court finds that even if the MFA required Rocky Mountain to attach a copy of the AIM maintenance agreement, Plaintiffs' claim nonetheless fails as a matter of law.

Viewing the evidence in the light most favorable to Plaintiffs, the failure to attach a copy of the AIM maintenance agreement to the UFOCs did not lead to a failure to state a material fact.  Here, Plaintiffs have not produced a copy of the AIM agreement for the

18

Court, nor have they alleged what material facts therein were not disclosed to them. Furthermore, the Court cannot conceive of a provision or fact in the AIM maintenance agreement that would be material. The Evavolds' UFOC stated that they were required to pay a $1922 annual maintenance fee to AIM. Although the Kielands' UFOC indicated that they would have to pay a $773 annual maintenance fee to RDS, the UFOC gave Rocky Mountain the authority to require the Kielands to upgrade their POS system and thereby pay the $1922 annual maintenance fee to AIM. Moreover, the Kielands and Evavolds each paid the annual maintenance fee for a couple of years. Thus, on this record, Rocky Mountain has not failed to disclose a material fact by not attaching a copy of the AIM maintenance agreement to the UFOCS that would give rise to a material nondisclosure under the MFA. Therefore, the Court grants summary judgment in favor of Rocky Mountain on this claim.

### B.   Material Misrepresentations

Additionally, Plaintiffs contend that Rocky Mountain made material misrepresentations in violation of the MFA. The Act specifically states:

> No person may offer or sell a franchise in this state by means of any written or oral communication which includes an untrue statement of a material fact or which omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Minn. Stat. § 80C.13, subd. 2 (2004). In particular, Plaintiffs contend that Rocky Mountain violated this section of the MFA by: (1) misrepresenting the capabilities of the AIM system; (2) by failing to disclose that it was waiving royalty fees from certain franchisees; and (3) by failing to disclose that it was not requiring some franchisees to pay for the AIM

system.  For the reasons stated above, the Court grants summary judgment in favor of

Rocky Mountain on these claims.

### C.    Discrimination

The MFA also provides in part, "[n]o person, whether by means of a term or

condition of a franchise or otherwise, shall engage in any unfair or inequitable practice in

contravention of such rules as the commissioner may adopt defining as to franchises the

words 'unfair and inequitable.'" Minn. Stat. § 80C.14 (2004).  The commissioner has

created a list of practices that are considered "unfair and inequitable." Minn. R.

2860.4400(B) (2004).  In particular, it is an "unfair and inequitable" practice for any person

to "discriminate between franchisees in the charges offered or made for royalties, goods,

services . . . or in any business dealing, unless any classification of or discrimination

between franchisees is based on franchises granted at different times, geographic, market,

volume or size differences, costs incurred by the franchisor, or other reasonable grounds

considering the purposes of [the Act]." *Id.*

Plaintiffs contend that Rocky Mountain discriminated against them by:  (1) requiring

them to pay franchise fees when Rocky Mountain was excusing others from paying them

and (2) requiring them to purchase the AIM system while excusing others.[2]  In response,

---

[2]      The Court has stated Plaintiffs' second allegation of discrimination as Plaintiffs'
articulated it in the Complaint.  The Court notes, however, that Plaintiffs have changed this
allegation in their opposition brief.  There, Plaintiffs allege that Rocky Mountain
discriminated against them by excusing other franchisees from *paying the support fees for
the AIM system.*  But because Plaintiffs never pleaded this allegation in their Complaint, the

(Footnote Continued on Next Page)

Rocky Mountain asserts that there are no allegations in the Complaint and no evidence in the record that Plaintiffs are similarly situated to these other franchisees. Accordingly, Rocky Mountain asserts that there is no evidence that Rocky Mountain engaged in less favorable treatment towards Plaintiffs than towards other franchisees. Alternatively, Rocky Mountain asserts that it had "reasonable grounds" under Minn. R. 2860.4400(B) (2004) for not requiring existing franchisees to convert the POS systems they had already purchased to the AIM system and for waiving certain franchisees' royalty fees.

Plaintiffs have not cited any cases, and the Court has not found any, that directly interpret this section of Rule 2860.4400. The Seventh Circuit, however, has interpreted nearly identical language in the Indiana franchise laws in *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 139 (7th Cir. 1990). In *Wright-Moore*, the Seventh Circuit held that "[d]iscrimination among franchises means that as between two or more similar franchisees, and under similar financial and marketing conditions, a franchisor engaged in less favorable treatment towards the discriminatee than towards other franchisees." 908 F.2d at 139. Finding this reasoning persuasive, the Court finds that Plaintiffs' discrimination claims fail as a matter of law. Here, Plaintiffs do not allege and there is no evidence in the record that

---

(Footnote Continued From Previous Page)
Court does not address it. Instead, the Court addresses the allegation that Plaintiffs pleaded in their Complaint—that Rocky Mountain discriminated against them by excusing other franchisees from *purchasing the AIM system.* The Court notes, however that Plaintiffs' claim that Rocky Mountain discriminated against them by excusing other franchisees from paying the support fees for the AIM system would also fail. Plaintiffs have not alleged and the record does not show that Plaintiffs were similarly situated to the franchisees that

(Footnote Continued on Next Page)

Plaintiffs are similarly situated to the franchises whose fees were waived.  In fact, Mr. Kieland testified that his franchise's performance never dropped to the level where Rocky Mountain would typically consider waiving royalty fees.

Furthermore, the Court finds that Rocky Mountain had "reasonable grounds" under Minn. R. 2860.4400(B) (2004) for not requiring existing franchisees to convert the POS systems they had already purchased to the AIM system.  Although the UFOC reserved Rocky Mountain's right to require that existing franchisees upgrade or update their POS systems, Rocky Mountain was not required to require franchisees to upgrade.  Here, Merryman explained that when Rocky Mountain adopts a major initiative, it generally implements that initiative on a prospective basis due to the capital outlay involved.  Merryman also explained that Rocky Mountain has consistently required new franchisees to use the AIM system.  On this record, the Court finds that Rocky Mountain did not wrongfully discriminate by requiring prospective franchisees to purchase the AIM system while allowing older franchisees to continue using the Casio system.

Additionally, the Court finds that Rocky Mountain had "reasonable grounds" under Minn. R. 2860.4400(B) (2004) for waiving certain franchisees' royalty fees.  The record reveals that Rocky Mountain agreed in certain limited circumstances to waive a franchisee's royalty obligations for a fixed period of time, generally not to exceed six months.  Rocky Mountain has agreed to such a waiver when a franchisee is encountering unforeseen and

---

(Footnote Continued From Previous Page)
Rocky Mountain temporarily excused from paying AIM fees.

difficult operational challenges.  Pope testified that Rocky Mountain is presently waiving

five of Rocky Mountain's more than 300 franchisees due to their unique financial

situations.  On this record, the Court finds that Rocky Mountain has "reasonable grounds"

for granting royalty waivers in extremely limited situations based on franchisees' financial

distress.  Accordingly, Rocky Mountain is entitled to summary judgment on Plaintiffs'

discrimination claims and the Court therefore dismisses Count 1 of the Complaint.

## III.     Breach of Implied Covenant of Good Faith and Fair Dealing[3]

Finally, Rocky Mountain asserts that there is no basis in fact or law for Plaintiffs'

breach of implied covenant of good faith and fair dealing claim.  The implied covenant of

good faith and fair dealing is used to effectuate the parties' intentions or to honor their

reasonable expectations in entering into a contract.  *Bayou Land Co. v. Talley*, 924 P.2d

136, 154 (Colo. 1996).  Colorado courts have implied the duty of good faith and fair

dealing when one party has discretionary authority to determine certain terms of a contract,

such as quantity, price, or time.  *Id.*  The duty of good faith and fair dealing "does not

obligate a party to accept a material change in the terms of the contract or to assume

obligations that vary or contradict the contract's express provisions."  *Wells Fargo Realty*

*Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994).  Rather, the

duty requires "only that the parties perform in good faith the obligations imposed by their

agreement."  *Id.*

---

[3]      The Court applies Colorado law pursuant to the parties' Franchise Agreements.

(Footnote Continued on Next Page)

Plaintiffs assert that Rocky Mountain violated the implied covenant of good faith and fair dealing by attempting to terminate Plaintiffs' Franchise Agreements. Plaintiffs contend that Rocky Mountain attempted to terminate Plaintiffs' Franchise Agreements by issuing default notices that faulted Plaintiffs for not paying maintenance fees to AIM and for not transmitting information to Rocky Mountain. In response, Rocky Mountain asserts that it was contractually permitted to issue notices to cure in response to Plaintiffs' defaults under the Franchise Agreements. Additionally, Rocky Mountain contends that even if it attempted to terminate Plaintiffs' franchises, such action is not a cognizable claim in law.

The Court finds that Plaintiffs' claim fails as a matter of law. Here, it is undisputed that Plaintiffs elected to stop paying the AIM maintenance fee and that in response, Rocky Mountain issued the August 2004 and February 2005 Notices to Cure. It is also undisputed that Rocky Mountain withdrew those Notices to Cure. The Court finds that on this record, Rocky Mountain's issuance and subsequent withdrawal of the Notices to Cure cannot be deemed a breach of any provision of the Franchise Agreements or an implied covenant of good faith and fair dealing. Thus, Rocky Mountain is entitled to summary judgment on Plaintiffs' breach of the implied covenant of good faith and fair dealing claim. Accordingly, the Court dismisses Count VI of the Complaint.

## Conclusion

Accordingly, **IT IS HEREBY ORDERED THAT:**

---

(Footnote Continued From Previous Page)
(Kieland Franchise Agreement at 00942; Evavold Franchise Agreement at 00996.)

24

1.      Defendant's Motion for Summary Judgment (Doc. No. 20) is **GRANTED**.

2.      Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  October 18, 2006            s/Donovan W. Frank
                                    DONOVAN W. FRANK
                                    Judge of United States District Court